**Albert DeSALVO, Plaintiff,**

v.

**TWENTIETH CENTURY–FOX FILM CORPORATION and Walter Reade Organization, Inc., Defendants.**

Civ. A. No. 68–882–G.

United States District Court
D. Massachusetts.

June 16, 1969.

Thomas C. Troy and Mitchell Hadge, Boston, Mass., for plaintiff.

James P. Lynch, Jr., Esquire of Nutter, McClennen & Fish, Boston, Mass., for 20th Century-Fox.

Jerome P. Facher, of Hale & Dorr, Boston, Mass., for Walter Reade Organization, Inc.

## MEMORANDUM OPINION

GARRITY, District Judge.

Plaintiff filed this suit in the Massachusetts Superior Court for Suffolk County on September 29, 1968, to restrain and enjoin the release and showing of the defendant Twentieth Century-Fox Film Corporation's (hereinafter Fox) motion picture "The Boston Strangler", and for damages. Defendant removed the case to this court on October 1, and plaintiff's petition for a temporary restraining order was denied on that date after hearing. On October 7 the Walter Reade Organization, Inc. (hereinafter Reade), which had scheduled to open a six-week engagement of the motion picture in New York on October 16, 1968, was allowed to intervene as an additional party defendant.

After a hearing at which extensive testimony, including that of plaintiff, was received and at which the court viewed the motion picture, the motion for a preliminary injunction was denied on October 11. Trial commenced on December 20 and, after various short continuances, was concluded on December 30. In accordance with orders of the court the parties have filed requests for findings of fact and conclusions of law.

### Findings of Fact

1. The relevant facts begin over four years ago after the end of the wave of murders commonly attributed to the so-called "Boston Strangler." In November, 1964 plaintiff was arrested and charged by the Commonwealth of Massachusetts with ten separate indictments of robbery, assault, and other related non-capital crimes, and was committed by the Superior Court for Middlesex County to the Bridgewater State Hospital for pretrial psychiatric examination. After the examination, on February 4, 1965, the Mid-dlesex County Superior Court committed him to the Bridgewater State Hospital indefinitely upon a finding that he was not mentally competent to stand trial. At some time during this period, plaintiff's name became connected in some fashion with the so-called "Boston Strangler."

2. Plaintiff retained Attorney F. Lee Bailey, Jr., of Boston to represent him in late February or early March, 1965. One of the reasons for which Attorney Bailey was originally retained was to give plaintiff an opinion as to whether or not plaintiff's life story was saleable. At that time Attorney Bailey told plaintiff that in his opinion it would not be in plaintiff's interest for plaintiff himself to write a book about his life, but that there were a number of books upon the so-called "Boston Strangler" in the process of being written and that it might be possible for plaintiff to receive some compensation in return for an agreement not to sue the author and publisher. Plaintiff asked attorney Bailey to explore the latter possibility and Bailey did so over the next year.

3. On May 6, 1965, on a petition filed in the Probate Court for Middlesex County, temporary guardians of the estate and of the person were appointed for plaintiff. Plaintiff's brother Joseph De-Salvo was appointed guardian of his estate, and on May 11 bond was approved appointing George F. McGrath of Boston, an attorney and Commissioner of Corrections for the Commonwealth of Massachusetts, guardian of plaintiff's person. From that time until April 26, 1966, when the guardianship petition was dismissed and the guardianships terminated, Attorney McGrath was responsible for the management of plaintiff's affairs.

4. During the period of the temporary guardianship, Attorney McGrath helped plaintiff manage his finances and discussed his financial situation with him. In addition, plaintiff and Attorney McGrath discussed the possibility of plaintiff's receiving compensation for sale of the rights to his life history, particularly with regard to the ethical implications of plaintiff's accepting money from the sale

of his rights to stories of crimes in which he had participated. During the period of the temporary guardianship, as a result of his discussions with and observations of plaintiff, Attorney McGrath came to the conclusion that plaintiff was capable of handling his own business and financial affairs and he so informed the Probate Court at the hearing on April 26, 1966.

5. Dr. Robert R. Mezer, a psychiatrist licensed by the Commonwealth of Massachusetts, examined plaintiff on February 11, 1966, pursuant to the request of plaintiff's then counsel, Attorney Bailey. The purpose of the examination was to enable Dr. Mezer to give an expert opinion as to whether plaintiff should be released from his temporary guardianship. At the completion of the examination Dr. Mezer concluded that plaintiff was a chronic, undifferentiated schizophrenic but that he understood the import of guardianship, had a functional understanding of his financial affairs and condition, and was competent to handle his own financial and business affairs. Dr. Mezer testified to that effect at the hearing in the Probate Court on April 26, 1966.

6. Dr. Ames Robey, a psychiatrist licensed by the Commonwealth of Massachusetts and the State of Michigan, was Medical Director of the Bridgewater State Hospital from 1963 through July 21, 1966. In that capacity Dr. Robey visited plaintiff almost daily during plaintiff's stay at Bridgewater, conducted full psychiatric examinations on at least 23 occasions, and reported to various courts at various times as to plaintiff's mental condition. Dr. Robey also concluded from his examinations and observations that plaintiff was a chronic, undifferentiated schizophrenic; and testified at the hearing on April 26, 1966 that plaintiff required guardianship to conduct his business affairs.

7. Shortly after the Probate Court dismissed the petition for appointment of a guardian for plaintiff, Attorney McGrath left Massachusetts to assume his present position as Commissioner of Correction for the City of New York, New York. Attorney McGrath has kept in contact with plaintiff since that time and has advised him in regard to some business affairs.

8. In the spring of 1966, Attorney Bailey advised plaintiff that Gerold Frank was planning to publish a book entitled "The Boston Strangler" in which plaintiff would be named as the so-called "Boston Strangler." Attorney Bailey advised plaintiff that it was his opinion that Mr. Frank was going to publish his book whether or not he received a release from plaintiff and that if plaintiff wished to make an agreement with Mr. Frank it would be a good idea because there was a question as to whether or not plaintiff had anything to sell. Plaintiff told Attorney Bailey to see what could be done, and Attorney Bailey conducted further discussions with Mr. Frank and with his publisher and agent. At the conclusion of the discussions Attorney Bailey reported to plaintiff the substance of a proposed agreement, and plaintiff agreed to it. Mr. Frank's literary agent, the William Morris Agency of New York City, thereupon drew up a written agreement.

9. Although he was no longer serving as plaintiff's guardian, Attorney McGrath review the proposed agreement between plaintiff and Mr. Frank and discussed it with plaintiff. Attorney Bailey took the written agreement to plaintiff at Bridgewater on June 17, 1966, and explained the import and substance of the written agreement to plaintiff in detail. Plaintiff thereupon signed the agreement on June 17, 1966, in the presence of Attorney McGrath and Attorney Bailey, and both witnessed his signature. Both witnesses were of the opinion that plaintiff knew and understood the import of the agreement that he was signing and that he was signing it of his own volition.

10. Plaintiff testified that Attorney Bailey did not explain the contents of the agreement to him but rather that he simply placed the agreement before him and demanded that he sign it. This detailed testimony is utterly inconsistent with plaintiff's earlier testimony that he

did not remember signing the agreement and that he did not even know who he was. The court expressly rejected plaintiff's account of these events on the basis of the recurrent inconsistencies in plaintiff's testimony, plaintiff's selective recall which allowed him to testify to what he appeared to feel was advantageous to his case but almost completely precluded any meaningful cross-examination, and plaintiff's general demeanor on the witness stand.

11. The agreement signed by plaintiff on June 17, 1966 provides that plaintiff thereby released to Mr. Gerold Frank all rights that plaintiff may have had or might thereafter obtain to all literary and biographical material concerning plaintiff's life. The agreement specifically released to Mr. Frank plaintiff's rights to any published account of his life and to any motion picture or other dramatic representation, version, or portrayal of plaintiff. The agreement provided that Mr. Frank could assign any and all rights that he receive under the written agreement to any third party or parties. In addition, plaintiff agreed not to sue Mr. Frank or any assignee of Mr. Frank for libel, violation of a right of privacy, or "anything else" which might result for any work portraying plaintiff. In consideration for the release of the above rights plaintiff was to receive payments of money according to a specified schedule.

12. On June 27, 1966, Dr. Mezer again examined plaintiff. The examination was conducted to enable Dr. Mezer to testify at a hearing scheduled for June 30, 1966 on the issue of whether plaintiff was mentally competent to stand trial on the criminal charges which were still pending against him in the Middlesex Superior Court. Dr. Mezer found plaintiff to be alert and, after Attorney Bailey had reviewed the charges with plaintiff, very much aware of his situation.

13. Dr. Robey examined plaintiff a number of times during June, 1966 in an attempt to reach a conclusion as to plaintiff's mental competency to stand trial on the criminal charges pending against him. Dr. Robey concluded from these examinations that plaintiff understood the criminal charges, that he understood the possible consequences of those charges, and that he was able to understand and follow Attorney Bailey's instructions not to cooperate with Dr. Robey. Because of plaintiff's refusal to cooperate in a mental examination, Dr. Robey was not able to reach a definite conclusion as to plaintiff's mental competency to stand trial but, lacking evidence to the contrary, he continued to hold his previous opinion that plaintiff was not mentally competent to stand criminal trial.

14. On June 30, 1966, the Middlesex Superior Court held a hearing to determine whether plaintiff was mentally competent to stand trial. At this hearing both the Commonwealth and plaintiff took the position that plaintiff was mentally competent to stand trial. At the completion of the hearing the court found plaintiff mentally competent to stand trial and remanded him to custody to await trial.

15. Both Dr. Robey and Dr. Mezer qualified in the instant case as experts in psychiatry and testified to plaintiff's capacity to enter into a valid contract in June 1966. Dr. Mezer was of the opinion that, notwithstanding plaintiff's chronic, undifferentiated schizophrenia, plaintiff had the ability to understand his financial situation and the import and terms of the agreement with Gerold Frank; Dr. Robey was of the opinion that plaintiff lacked such understanding in June 1966 and that he continues to lack such capacity to this day. The court rejects Dr. Robey's opinion on the grounds of (a) his stated difficulties in interviewing plaintiff in June 1966, (b) the previous rejections of his opinions on related issues of plaintiff's mental capacity before the Probate Court in April 1966 and before the Superior Court in June 1966, and (c) the court's own observations of plaintiff on the witness stand. The court accepts and adopts Dr. Mezer's testimony and finds that in June 1966 plaintiff was aware of and understood

his financial situation and understood the substantial import and terms of the agreement with Gerold Frank.

16. On July 4, 1966 plaintiff signed a letter to Mr. Frank informing him that plaintiff had appointed Attorney Mc-Grath his agent and fiduciary in regard to plaintiff's agreement with Mr. Frank, directing that all payments to be made to plaintiff under the agreement should be delivered to Attorney McGrath payable to "Robert McKay", and that Attorney McGrath had authority to endorse and cash those checks. This letter was witnessed by Attorney Bailey. Attorney Bailey testified that plaintiff understood the import of the letter and voluntarily signed it. No evidence was offered that this letter or the authorization given by it has ever been revoked.

17. After receipt of the July 4, 1966 letter the William Morris Agency, as agent for Mr. Frank, sent a check for $15,000 to Attorney McGrath to meet the advance provided for in the June 17, 1966 agreement. Attorney McGrath endorsed the check and delivered it to Attorney Bailey who cashed the check and deposited the proceeds in his office account. To date a total of $18,443.52 (including the $15,000 advance) has been deposited in Attorney Bailey's account.[1]

18. Gerold Frank's book, "The Boston Strangler", was published in October 1966 and a paperback edition was released in 1967. The book has had substantial sales.[2] The book specifically names plaintiff as the "Boston Strangler" and deals very extensively and in detail with events which plaintiff is stated to have participated in as the "Strangler." The book makes no apparent substantial attempt to deal with plaintiff or his involvement as the "Strangler" in a sympathetic or complimentary light. It does not appear, however, that plaintiff has at any time protested publication or sale of the book or attempted to stop its sale, although plaintiff read the book in early 1967.

19. At the trial for the criminal assaults in the Middlesex County Superior Court, on January 13, 1967, Attorney Bailey made an opening for the defense in which he stated that DeSalvo was insane and had committed 13 acts of homicide within a period of 18 months. These assertions in court were made by Attorney Bailey as a result of lengthy discussions between him and the plaintiff.

20. By agreements dated May 10, 1967 and November 2, 1967, Fox purchased from Gerold Frank the portions of the agreement which plaintiff had made with Mr. Frank on June 17, 1966 which related to the motion picture and related rights.

21. In January 1968 defendant began filming its motion picture "The Boston Strangler" in Boston. The filming was attended by much publicity, particularly in the newspapers in the Boston area, and was the subject of considerable public interest. Plaintiff was aware of the filming and familiar with many details of the movie. He corresponded with the director of the motion picture and with consultants working on it. During the filming and subsequent preparation of the motion picture, plaintiff made no attempts to stop filming or preparation of the motion picture.

22. While the motion picture "The Boston Strangler" deals specifically with the series of murders committed in the Boston metropolitan area, it depicts generally typical problems confronted by any large city in protecting itself against sexual deviates unable to control their own

---

1. These moneys have been used to pay expenses but not legal fees incurred in connection with the criminal defense and appeal of plaintiff, to disburse $3000 to one of plaintiff's brothers at plaintiff's request to pay off a financing agreement on the brother's automobile, and a deposit remains to cover a possible judgment that may be returned against Attorney Bailey for a reward offered for the non-fatal capture and return of plaintiff to custody after an escape from Bridgewater.

2. The affidavit of Ezra M. Eisen, Secretary and Treasurer of the publisher, The New American Library, submitted at the hearing on the motion for a temporary injunction, indicates that total sales of the book through August 1968 exceeded 860,000 copies.

conduct. In its portrayal of plaintiff, the motion picture is concerned largely with a struggle within himself to confess to crimes of which he considered himself guilty. At the very least, the portrayal of plaintiff in the motion picture is no more condemnatory of him than is the book.

23. Although plaintiff was aware that defendant was preparing to release the motion picture "The Boston Strangler" at least as early as the fall of 1967, the first indication to defendant Fox that plaintiff had any criticism of the film or would make any attempt to prohibit exhibition of the motion picture was in a letter from plaintiff's present trial counsel to defendant on September 18, 1968. This suit was brought eighteen days prior to the scheduled public release of the motion picture by defendant Fox. No explanation for the delay in protesting and seeking to prevent exhibition of the motion picture has been offered, other than a suggestion that plaintiff was confused.

*Conclusions of Law*

■ 1. Plaintiff executed an agreement on June 17, 1966 in favor of Gerold Frank releasing for valuable consideration all rights that he might have to the use of his name in, but not limited to, literary works and motion pictures in connection with incidents commonly known as "The Boston Strangler." At the time that plaintiff executed the agreement of June 17, 1966 in favor of Gerold Frank, plaintiff was aware of and understood the import, purpose and terms of the agreement. Plaintiff's mental condition at the time of his signing the June 17, 1966 agreement, therefore, was not such as to render it void or voidable. See Meserve v. Jordan Marsh Co., 1960, 340 Mass. 660, 165 N.E.2d 905.

■ 2. Plaintiff has received the consideration as it has become due as provided in the June 17, 1966 agreement.

The rights released by plaintiff in the June 17, 1966 agreement involving the production of a motion picture portraying plaintiff as the "Boston Strangler" have been duly assigned to defendant Fox for valuable consideration. The June 17, 1966 agreement, as assigned to defendant, therefore bars recovery by plaintiff for an alleged defamation or invasion of privacy of plaintiff by a motion picture owned by defendant which portrays plaintiff as "The Boston Strangler." Sharman v. C. Schmidt & Sons, Inc., E.D.Pa., 1963, 216 F.Supp. 401.

■ 3. Due to the exceptional public interest in the so-called "Boston Strangler" incidents and the extensive publicity surrounding plaintiff as a possible "Boston Strangler", particularly pending and during his criminal trial on the criminal charges on which he was convicted and is presently confined, the public interest in the "Boston Strangler" and in plaintiff as a possible "Boston Strangler" preclude maintenance of an action by plaintiff for defamation or invasion of privacy unless plaintiff proves publication that is knowingly false or falsely made with reckless disregard for the truth. Time, Inc. v. Hill, 1967, 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456. Plaintiff has not met the burden of proving that the portrayal of plaintiff as the "Boston Strangler" in defendant's film of that name was knowingly false or was falsely made with a reckless disregard for the truth; the vast preponderance of the evidence establishes the contrary.

■ 4. Plaintiff unreasonably delayed without justifiable excuse the commencement of this action. Maintenance of this action is therefore barred under the equitable doctrine of laches.

On the basis of the forgoing findings of fact and conclusions of law, judgment is ordered for the defendant and the defendant-intervenor.