JOSEPH C. TRIPOLI *vs.* BOSTON HERALD-TRAVELER
CORPORATION
(and a companion case).

Essex.    February 3, 1971. — April 2, 1971.

Present: TAURO, C.J., SPALDING, CUTTER, SPIEGEL, & BRAUCHER, JJ.

*Libel and Slander.*

In an action for libel against a newspaper for the publication of an
article referring to the plaintiff as a self announced suspect in con-
nection with an unsolved mail robbery which involved a huge sum of
money and received national attention, and concentrating on the in-
vestigatory activities of officials in regard to the plaintiff and others
after the robbery, and against the employee of the newspaper who
wrote the article about two years after the robbery occurred, the
defendants were entitled, even if they did not establish truth as a
defence and the article was libellous per se, to the defence that the
plaintiff had become a "public figure" involved in a matter of "public
interest," where it appeared, among other circumstances, that soon
after the robbery the plaintiff told a reporter about the investigation,
about a confidential police circular naming the plaintiff as a suspect,
and about polygraph tests to be given him, that he held a press con-
ference and participated in radio and television interviews, and that
during the two years following the robbery he continued to perpet-
uate the publicity by similar activities; and, there being no evidence
of actual malice on the part of the defendants, it was error to deny
their motions for directed verdicts.

Two ACTIONS OF TORT. Writs in the Superior Court dated
July 8, 1965.

The actions were tried before *Vallely, J.*

*Walter J. Hurley* for the defendants.

*Norman M. Shack* for the plaintiff.

SPIEGEL, J.   These are actions for libel brought against a
newspaper corporation and against Irene Saint, a former
employee of the newspaper.   The jury returned verdicts for
the plaintiff in the sum of $20,000.   The cases are before us
on the defendants' exceptions.   Two of these exceptions
relate to the denial of motions for directed verdicts.

These cases have their origin in what has become generally known as the "Great Plymouth Mail Robbery." Although not specifically testified to at the trial there can be no doubt that on August 14, 1962, postal employees, riding in a United States mail truck, were robbed of over $1,500,000, in cash, contained in packets of registered mail and destined for delivery to the Federal Reserve Bank in Boston.

To place the publication of the alleged libel in proper perspective we think it advisable to summarize certain testimony of the plaintiff of events which occurred prior to the publication of the story which forms the basis of the plaintiff's cases. Almost all of this testimony was elicited from the plaintiff during cross-examination.

At the time of the robbery the plaintiff was employed as a janitor in the "Arcidi Building" and continued to be employed there in that capacity until about August, 1966, "when the building changed hands." Shortly after the robbery and in connection therewith, the plaintiff began to be investigated by postal authorities. In the fall of 1962, postal inspectors searched his home and recorded the serial numbers of three one dollar bills that the plaintiff's wife had in her possession. In October or November of 1962, about two months after the robbery, the plaintiff talked with one Norton, a reporter for the Herald-Traveler. The plaintiff gave Norton information about the investigation and about a confidential police notice that the plaintiff had seen at the postal department. This circular named the plaintiff, one Joseph Kelley, one Thomas Richards and one "Billie" Agistotelis as being suspects in connection with the robbery.

The plaintiff also gave Norton information about some polygraph tests that the plaintiff was to undergo on two separate days under the direction of his attorney, Mr. F. Lee Bailey. Subsequently, on December 13, 1962, this information together with a picture of the plaintiff appeared in the newspaper.

The polygraph test taken on the first day was termed by Mr. Bailey's expert as "inconclusive." Mr. Bailey told the

plaintiff that this was so because he was nervous. He "passed the . . . [second test] with flying colors." On December 28, 1962, after consulting with Mr. Bailey, the plaintiff held a press conference at Mr. Bailey's office. When he arrived at the office there were newspapermen and photographers there as well as people from radio and television stations. Of the three other individuals named on the circular, Agistotelis was "probably" present and Kelley and Richards were "possibly" also present. At the press conference pictures were taken of the plaintiff and he was interviewed.

In December, 1962, and throughout 1963 and early 1964, there were radio and television interviews of the plaintiff and publications concerning the polygraph tests and of his harassment by the postal inspectors. In 1963, the plaintiff saw an article in the Saturday Evening Post called "Hilarious Hunt for Highwaymen" which had his picture and showed the truck that was robbed. It also had another picture of the plaintiff leaving Mr. Bailey's office. The publications about the plaintiff in 1962, 1963 and early in 1964 were "mentioned" to him by others and "[m]any" of these people asked where he was hiding the money.

On August 9, 1964, the story which forms the subject of this dispute was written by Miss Saint and bore her by-line. It was published in the Sunday edition of the newspaper. The main headline in large print ran about three-fourths of the way across the page. It bore the legend "The Incredible Aftermath of the Great Mail Robbery" and there was a subheadline which read: "They Say They're The Chief Suspects In the Nation's Biggest Holdup." To the right of the subheadline there were three photographs, one of Richards, one of the plaintiff and one of Kelley. The story begins with a statement that the three pictured persons are serving an extraordinary sentence of six years as self-announced suspects of a major crime not as yet resolved.

After relating the known details of the circumstances of the robbery, the efforts made by United States postal inspectors to locate the culprits, that none of the stolen money

had been recovered, that no one had been arrested and that there were no clues, the story concentrates on the investigatory activities of the authorities in regard to Richards, Kelley and the plaintiff. The story relates that the plaintiff retained Mr. Bailey as his attorney after learning about the police circular naming the plaintiff as a suspect and that he sought a lie detector examination. The article also describes the "voluntary appearance" of the plaintiff, Kelley and Richards on "TV and radio to explain publicly their positions as suspects and proclaim their innocence."

At the trial, the court ruled that the article was libellous per se, that there was no evidence that the plaintiff was a public figure, that the defendants did not establish truth as a defence, and that the defendants were required to prove that the plaintiff actually committed the robbery rather than that he was merely a suspect. The court concluded that the plaintiff was entitled to recover as a matter of law.[1]

In view of our ultimate conclusion we deem it advisable to only discuss the questions whether the plaintiff was a public figure and whether these cases involved a matter of public interest.

We agree that it is a generally accepted legal principle that words published, when read as a whole and which create the impression that a person has committed a crime, are libellous per se. *Lyman* v. *New England Newspaper Publishing Co.* 286 Mass. 258, 262. *King* v. *Northeastern Publishing Co.* 294 Mass. 369. However, this does not entitle a person to recover where a matter of "public interest" is involved, *Time, Inc.* v. *Hill,* 385 U. S. 374, 388, or where the person has attained the status of a "public figure," *Curtis Publishing Co.* v. *Butts,* 388 U. S. 130, 155, unless actual malice is shown.

It has long been established in this Commonwealth that "[t]he editor of a newspaper has the right, if not the duty, of publishing, for the information of the public, fair and reasonable comments, however severe in terms, upon any-

---

[1] All of the rulings appear in the charge to the jury.

thing which is made by its owner a subject of public exhibition, as upon any other matter of public interest; and such a publication falls within the class of privileged communications for which no action can be maintained without proof of actual malice." *Gott* v. *Pulsifer,* 122 Mass. 235, 238–239. See *Retailers Commercial Agency, Inc., petitioner,* 342 Mass. 515, 521. Several recent pronouncements of the Supreme Court of the United States have taken a similar view to that stated in the *Gott* case. These cases made it clear that First Amendment guaranties are to be broadly applied in areas where the press exercises its obligation to convey news of public concern. In the leading case of *New York Times Co.* v. *Sullivan,* 376 U. S. 254, 279–280, the court held that the "constitutional guarantees require . . . a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice' — that is, with knowledge that it was false or with reckless disregard of whether it was false or not." In the case of *Time, Inc.* v. *Hill,* 385 U. S. 374 (although the case involved an action under a New York right of privacy statute as opposed to a libel action), the court applied the same standard of knowledge of or reckless disregard of falsity as applied in *New York Times Co.* v. *Sullivan,* where "matters of public interest" are involved. 385 U. S. at 388. The doctrine of *New York Times Co.* v. *Sullivan* was further expanded to cover a "public figure" in the case of *Curtis Publishing Co.* v. *Butts,* 388 U. S. 130, and its companion case, *Associated Press* v. *Walker.* In the *Curtis* case, the court said that both respondents "commanded sufficient continuing public interest and had sufficient access to the means of counterargument to be able 'to expose through discussion the falsehood and fallacies' of the defamatory statements" and that one of the respondents attained the status of a public figure "by his purposeful activity amounting to a thrusting of his personality into the 'vortex' of an important public controversy." Page 155.

The concept of what is a "public figure" has been dis-

cussed in many Federal cases. See *Lewis* v. *Vallis*, 356 Mass.
662, 667–668, for a list of some of the cases. See also
*Man* v. *Warner Bros. Inc.* 317 F. Supp. 50 (S. D. N. Y.) and
cases cited at p. 52. In the *Man* case, the plaintiff, a pro-
fessional musician, mounted the stage at the Woodstock
Festival at "someone's" request. The court there said
that the "Plaintiff, by his own volition, placed himself in
the spotlight of a sensational event which exposed him to
the glare of publicity. That fact, without more, we think,
makes him newsworthy and deprives him of any right to
complain." Page 53.

In the case of *DeSalvo* v. *Twentieth Century-Fox Film
Corp.* 300 F. Supp. 742 (D. Mass.), a case involving the
so called "Boston Strangler," the court held that in view
of the "exceptional public interest" surrounding the case
and the "extensive publicity surrounding plaintiff as a
possible 'Boston Strangler' . . . the public interest in the
'Boston Strangler' and in plaintiff as a possible 'Boston
Strangler' preclude maintenance of an action by plaintiff
for defamation or invasion of privacy unless plaintiff proves
publication that is knowingly false or falsely made with
reckless disregard for the truth." Page 747.

We think the standard of knowledge of or reckless dis-
regard of falsity as enunciated in the *New York Times* case
and applied in the *Time, Curtis* and *DeSalvo* cases is appli-
cable to the instant cases. The facts in the *DeSalvo* case
are closely akin to the one before us. In both cases there
was an extensive investigation which had received wide-
spread publicity. Both cases involve crimes of "excep-
tional public interest," and both plaintiffs received extensive
publicity as suspected participants. Neither one had been
indicted or tried for the *particular* offences[2] of which he was
suspect.

---

[2] DeSalvo was not indicted or tried for any of the strangulation murders
that were generally attributed to the so called Boston Strangler. He was
tried and convicted of assault, robbery and other related noncapital crimes.
*DeSalvo* v. *Twentieth Century-Fox Film Corp., supra,* 743, 747. It is interest-
ing to note that DeSalvo was also represented by Mr. F. Lee Bailey in con-
nection with the above crimes and at the time extensive publicity was gener-
ated about DeSalvo as a possible Boston Strangler.

In addition, we note that the Plymouth mail robbery was not a case of petty larceny. It involved a huge sum of money. It received national attention. It is readily apparent to us that much of the publicity the plaintiff received prior to the article and most of the material about him in the article itself derived from his own palpably engineered efforts to project himself into the public limelight and that as a result the plaintiff moved from obscurity to notoriety.[3] In choosing to publicly expose himself by granting interviews in October or November of 1962, the plaintiff catapulted himself into the "'vortex' of an important public controversy" and attained the status of a "public figure" within the scope of the Curtis case. Then on December 28, 1962, apparently following the advice of his attorney, Mr. Bailey, he further projected himself onto the scene by calling a press conference in conjunction with a cast of characters assembled by Mr. Bailey who in one way or another were under suspicion because of the robbery. There, the plaintiff answered questions and made statements to newspapermen, and to radio and television personnel. Photographs were taken and a film of the interview was broadcast that evening on television. He continued to perpetuate the publicity by granting interviews regarding the mail robbery in 1963 and 1964. These activities were hardly the tactics of a person who sought to avoid the magnifying glare of

---

[3] In Time, Inc. v. Hill, 385 U. S. 374, 391, the Supreme Court expressly reserved opinion upon "the question whether the same standard should be applicable both to persons voluntarily and involuntarily thrust into the public limelight." In view of our conclusion that the plaintiff obtained publicity largely by the fruit of his own efforts, we need not resolve this question.

We quote at length from the Time case to illustrate how the Supreme Court has construed broadly the concept of a matter of public interest: "The guarantees for speech and press are not the preserve of political expression or comment upon public affairs, essential as those are to healthy government. One need only pick up any newspaper or magazine to comprehend the vast range of published matter which exposes persons to public view, both private citizens and public officials. Exposure of the self to others in varying degrees is a concomitant of life in a civilized community. The risk of this exposure is an essential incident of life in a society which places a primary value on freedom of speech and of press. 'Freedom of discussion, if it would fulfill its historic function in this nation, must embrace all issues about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period.'" Page 388.

publicity.   In the circumstances, he cannot now complain of libel unless he proves actual malice.

In view of what we have said, even if we assume that the trial judge correctly ruled that the article was libellous per se and that the defendants did not establish truth as a defence, we must conclude that the judge's ruling that the defence of fair comment on "a person of public interest . . . is not available to the defendants in . . . [these] case[s]" was error.   It remains to be determined, however, whether the evidence met the actual malice standard as delineated in the *Curtis* and *DeSalvo* cases and in our own case of *Gott* v. *Pulsifer*, 122 Mass. 235.   Having read the entire transcript, we agree with the judge's ruling that "[t]here is no evidence . . . of any actual malice" and that "no evidence [was] offered" on this issue.   It being established that there was no malice, it was error to deny the defendants' motions for directed verdicts.

*Exceptions sustained.*

*Judgments for the defendants.*