JOHN W. PRIESTLEY, JR. *vs.* HASTINGS & SONS PUBLISHING
COMPANY OF LYNN.

Essex.   April 8, 1971. — June 30, 1971.

Present: SPIEGEL, REARDON, QUIRICO, & BRAUCHER, JJ.

*Libel and Slander. Constitutional Law,* Freedom of speech and press,
Libel. *Malice.*

In an action for libel against a newspaper for the publication, under
time constraints limiting investigative work, of articles relating to
the plaintiff's involvement in an event of public or general
concern, the decision in *Rosenbloom* v. *Metromedia, Inc.,* 403 U. S.
29, required application of the "actual malice" standard articul-
ated in *New York Times Co.* v. *Sullivan,* 376 U. S. 254, as a matter
of Federal constitutional law. [121–123]

In an action for libel by the architect of a school of a town against a
newspaper for the publication on three successive days of a
different article respecting a controversy as to alleged defects in
the construction of the school, which the town manager was
investigating and the blame for which he attributed to the
plaintiff, the evidence did not warrant a finding of the "actual
malice" required for a determination of liability on the part of the
defendant under Federal constitutional law where it appeared
that the three articles together were an accurate account of the
controversy, that the views on both sides were fully and accurately
stated and the defendant in no way vouched for either position as
correct, that most of the claims made which could feasibly have
been verified by the reporter who wrote the articles were verified,
that imputations made by both the manager and the plaintiff
about the competence, conduct and good faith of the other were
fairly and honestly reported, and that there was no evidence at the
trial, other than the plaintiff's own testimony, that anything
contained in any of the articles was false. [123–125]

TORT.   Writ in the Superior Court dated October 24,
1967.

The action was tried before *Macaulay,* J.

*Edward J. Barshak* (*Stanley R. Berkowitz* with him) for the
defendant.

*Thomas J. Carens* for the plaintiff.

REARDON, J.   This is an action of tort for libel stemming from the publication of three articles by the defendant in its newspaper, the Daily Evening Item (Item).   The jury returned a verdict for the plaintiff of $25,000.   The defendant has taken exceptions alleging two errors.   Both hinge on whether the "actual malice" standard articulated by the United States Supreme Court in *New York Times Co.* v. *Sullivan,* 376 U. S. 254, is applicable to the case.   The trial judge ruled that this standard was not applicable and subsequently denied the defendant's motion for a directed verdict.   However, the recent Supreme Court decision in *Rosenbloom* v. *Metromedia, Inc.* 403 U. S. 29, which came down after the trial of this case, makes the contrary conclusion mandatory as a matter of Federal constitutional law.   The facts of the case before us bring it within the formulation contained in the *Rosenbloom* case of circumstances in which the "actual malice" standard is required, and under that standard the defendant's motion for a directed verdict should have been granted.

We summarize the evidence as follows.   The plaintiff is an architect by profession.   He was commissioned by the town of Saugus in 1965 to build a new junior high school. He testified at the trial that he acted as the official for the town with reference to this building during the period of its construction.   He first worked with school officials and State agencies to evolve the final design of the school and subsequently sent out plans for the purpose of getting bids. The bids were received in behalf of the town in the presence of the plaintiff, who acted for the town in seeing that the building complied with plans and specifications.   Construction of the school was completed in September, 1966, and it has been in use during the school year ever since.

On October 3 and 4, 1967, meetings of the selectmen of Saugus were held, at which Paul H. Boucher, then town manager, made certain charges with respect to alleged defects in the construction of the school and announced that he was launching an investigation into them.   The substance of what he said appeared in an article in the Item on

October 4, written by Dwight Buell who had attended the meetings as a reporter.[1]

On October 16, 1967, there was another selectmen's meeting at which Boucher reiterated his dissatisfaction with the school. Buell was again in attendance and wrote an article, which appeared on October 17, reporting Boucher's statements to the selectmen. Among the statements attributed to Boucher were that $200,000 in funds might have been misused and that the F. B. I. wanted to enter the case if it had jurisdiction. Buell telephoned the plaintiff the next day for his comment on Boucher's charges. The plaintiff emphatically denied them and himself charged that Boucher's investigation was "politically-motivated." The plaintiff's rebuttal duly appeared on the same day, October 18, in an article by Buell in the Item which also contained further developments in the Boucher investigation. The final allegedly libellous article appeared on October 19, after Buell had spoken to Boucher. Boucher's remarks, as recounted by Buell in this article, were more narrowly focussed on the plaintiff's alleged "illegalities, incompetence and bad faith." The article contained, inter alia, statements attributed to Boucher that he intended to seek to have the plaintiff's registration revoked by the State Board of Registration of Architects; that the district attorney's office was not investigating, only because it did not have the staff necessary; and that the manager's office had filed a complaint against the plaintiff with the American Institute of Architects' Ethics Committee.

There was uncontradicted testimony by Buell that the October 17 article was an accurate report of statements made at the selectmen's meeting of the day before and that the article of October 19 represented Boucher's words, which were not "changed, improved or altered." The plaintiff himself agreed with Buell that the October 18 article was a substantially accurate summary of the conversation the

---

[1] Although the plaintiff testified that many of the statements in the October 4 article were untrue, he does not base any part of his action upon them. He complains only of the articles of October 17, 18 and 19, 1967.

two had had.  Buell testified that he did not check the various detailed charges with respect to inadequacies in the finished school and irregularities in its construction because the school had been a subject of controversy for some months and he had previously exhausted himself checking such details.  He saw no need to go through it again.  He did, however, take steps to verify certain other charges reported.  These steps will be dealt with in more detail below.

1. The issue at the trial and as originally presented to us was whether the evidence showed that the plaintiff was a "public official" or "public figure" so as to call for application of the "actual malice" standard announced and applied in the *New York Times* case.  This standard, which requires proof that the alleged libeler acted "with knowledge that . . . [the publication] was false or with reckless disregard of whether it was false or not" (*New York Times Co.* v. *Sullivan, supra,* at 280), was limited in the *New York Times* case to cases in which the plaintiff was a "public official." In the *New York Times* case itself, however, and on subsequent occasions, the Supreme Court consistently refused to delimit this designation, recognizing that "[i]n many situations, policy determinations which traditionally were channeled through formal political institutions are now originated and implemented through a complex array of boards, committees, commissions, corporations, and associations, some only loosely connected with the Government. This blending of positions and power has also occurred in the case of individuals so that many who do not hold public office at the moment are nevertheless intimately involved in the resolution of important public questions . . .." *Curtis Publishing Co.* v. *Butts*, 388 U. S. 130, 163–164.  See *New York Times Co.* v. *Sullivan, supra,* at 283, fn. 23; *Rosenblatt* v. *Baer*, 383 U. S. 75, 85 (actual malice standard applicable to publication about former supervisor of county recreation area employed by and responsible to the three county commissioners); *Greenbelt Coop. Publishing Assn. Inc.* v. *Bresler*, 398 U. S. 6 (actual malice standard applicable to publication about locally prominent real estate developer

engaged in negotiations with city involving construction of high density housing and a new school). Lower Federal courts and this court likewise increasingly have applied the actual malice standard to publications about participants in events of public interest, regardless of their formal connection with government. See, e.g., *Pauling* v. *Globe-Democrat Publishing Co.* 362 F. 2d 188 (8th Cir.) (prominent scientist involved in promoting nuclear test ban treaty); *Cepeda* v. *Cowles Magazines & Bdcst. Inc.* 392 F. 2d 417 (9th Cir.), cert. den. 393 U. S. 840 (National League baseball player); *Time, Inc.* v. *McLaney,* 406 F. 2d 565 (5th Cir.), cert. den. sub nom. *McLaney* v. *Time, Inc.* 395 U. S. 922 (gambler involved in political campaign in another country); *Tripoli* v. *Boston Herald-Traveler Corp.* 359 Mass. 150 (janitor suspected of involvement in the "Great Plymouth Mail Robbery").

It was not until the *Rosenbloom* case, however, that the Supreme Court abandoned its reliance on the increasingly amorphous designation of "public official" or, alternatively, "public figure" as that feature which must be present to call for application of the actual malice standard. The *Rosenbloom* case involved a purely private citizen engaged in the business of selling literature of somewhat doubtful propriety. Upon his acquittal on obscenity charges related to his books and magazines, the plaintiff sued a radio station which had used such terms as "smut literature racket" and "girlie book peddlers" (p. 36) in its broadcast reports of his arrest and subsequent suit for injunctive relief. In discussing the law to be applied to determine whether the actual malice standard was applicable to this plaintiff, the court squarely ruled that the relevant issue was not the particular plaintiff involved but rather the events which were the subject of the publication. "[T]he determinant whether the First Amendment applies to state libel actions is whether the utterance involved concerns an issue of public or general concern . . . ." P. 44. The reason for this shift in focus was stated as follows: "If a matter is a subject of public or general interest, it cannot suddenly become

less so merely because a private individual is involved, or because in some sense the individual did not 'voluntarily' choose to become involved. The public's primary interest is in the event; the public focus is on the conduct of the participant and the content, effect, and significance of the conduct, not the participant's prior anonymity or notoriety." P. 43

On the facts before it — "a libel action . . . by a private individual against a licensed radio station for a defamatory falsehood in a newscast relating to his involvement in an event of public or general concern" — the court held that the actual malice standard was applicable. P. 52. That holding clearly requires that the same standard be applied here. The publication here, as there, related to the plaintiff's involvement in an event of public or general concern. In addition, the defendant newspaper here, like the radio station there, performed much the same function of conveying news to the public under time constraints which did not permit the investigative work to which those connected with a magazine or book could more reasonably be held.

2. The evidence against the defendant in the instant case showed at most negligence and not the "knowledge that . . . [the publication] was false or . . . reckless disregard of whether it was false or not" (*New York Times Co.* v. *Sullivan, supra,* at 280), which under the *Rosenbloom* case is constitutionally required. It was error, therefore, not to grant the defendant's motion for a directed verdict.

The first allegedly libellous article, that of October 17, was a report of a meeting of the board of selectmen. Here, as in the *Greenbelt* case involving reports of sessions of the city council, there was no evidence that the report was anything but "accurate and full." Given the time limit within which he was working (compare *Curtis Publishing Co.* v. *Butts,* 388 U. S. 130, 157), it was not unreasonable that Buell did not call the plaintiff to comment on Boucher's charges directed at him. Other statements, such as that "$200,000 in funds may have been 'misused,' " were simply not susceptible of verification in the span of a few hours.

Priestley *v.* Hastings & Sons Publishing Co. of Lynn.

In the October 17 article, as in the two succeeding ones, remarks of Boucher relative to the involvement of the F. B. I. in the case were reported. Buell testified that he called the F. B. I. to see what connection they had with the case, although it is not clear from the record when he did so. No negligence, much less "actual malice," is shown by the fact that having failed to elicit any information from the F. B. I. Buell proceeded to report Boucher's remarks on the subject. Nor was there any evidence presented at the trial that the remarks as reported were false; everything about the F. B. I. appearing in the three articles is consistent with the plaintiff's testimony that he had no communication with the F. B. I.

The article of October 18 consisted chiefly of the plaintiff's reply to Boucher's charges, based on Buell's telephone call to the plaintiff on that day. The fact that he made such a call is evidence of Buell's good faith and his desire to insure that both sides of the controversy be heard. Buell did not take sides on the issue but rather reported the plaintiff's remarks with the same impartiality with which he had reported Boucher's. That article also contained the information, which Buell had obtained on his own, that the district attorney's office was not investigating, as well as the information that Boucher had turned over certain facts to the F. B. I.

The final article, that of October 19, contained by far the most damaging statements about the plaintiff. It was based on a conversation Buell had with Boucher on October 18, presumably after the former's talk with the plaintiff. It was entirely reasonable for Buell to give Boucher a chance to reply to the attack made on him by the plaintiff, which was considerably more personal than Boucher's general statements about defects in the school which had been reported on October 17. Turning to the contents of the article of October 19, we note that Boucher's reported statement that he would seek to have the plaintiff's registration revoked by the State Board of Registration of Architects was, of course, not susceptible of verification. In addition, there was un-

contradicted evidence that the statement that Boucher accused the plaintiff of "illegalities, incompetence and bad faith" was an exact quotation, and it was reported as such. It was by no means incumbent upon Buell as a reporter to inquire of Boucher what he meant by those terms. Other statements reported in which Boucher expressed his opinion of the plaintiff's ability and responsibility could not have been objectively verified; a few general statements about the condition of the school[2] also probably could not have been verified in the brief time Buell had to publish the story while it was still newsworthy. Buell could have verified Boucher's statement that he had filed a complaint with the American Institute of Architects' Ethics Committee, but his failure to do so was at most negligent. In addition, as with Boucher's reported remarks about the F. B. I., there was no evidence presented at the trial that this statement was not true.

In short, the three articles together are an accurate account of a local controversy of legitimate public concern. The views of both sides were fully and accurately stated and the defendant newspaper in no way vouched for either position as correct. Most of the claims made which could feasibly have been verified by the reporter were verified. The imputations made by both Boucher and the plaintiff about the competence, conduct and good faith of the other could only be fairly and honestly reported, and this was done. There was no evidence at the trial, other than the plaintiff's own testimony, that anything contained in any of the articles was false. Under the applicable law this evidence did not warrant a verdict for the plaintiff.

*Exceptions sustained.*
*Judgment for the defendant.*

---

[2] For instance, Buell reported that Boucher said that the town was still trying to get the school in a condition acceptable to the State safety engineer, and that it would cost the town over $100,000 to correct all the defects due to poor construction, deletions, and poor judgment.