Fabricant, J.
INTRODUCTION
This action arises from a news article published in a weekly newspaper, Bay Windows, which serves the Boston area gay and lesbian community, regarding an organization known as the Greater Boston Business Council (GBBC), which also serves that community. The plain tiff David Shephard, a member of the GBBC’s board of directors, alleges that the article defamed him and violated his statutory right to privacy. The plaintiff corporation, through which Shephard conducts his public relations business, alleges that it too was defamed. Presently before the Court are cross motions for summary judgment. For reasons that will be explained, the plaintiffs’ motion will be denied, and the defendant’s motion will be allowed in part and denied in part.
BACKGROUND
The record reveals the following factual background.[1] The defendant Bay Windows, Inc., publishes and distributes a weekly newspaper targeted at Greater Boston’s gay and lesbian community, known as Bay Windows. As of June 2000, Bay Windows had an average weekly press run of approximately 22,500 copies. The article that is the subject of this case appeared in Bay Windows on June 22, 2000. That edition included paid advertisements for local and national businesses.
The GBBC is a Boston-based non-profit organization that serves professionals in the gay, lesbian, bisexual and transgendered community. It functions similarly to a chamber of commerce in that it regularly offers scheduled events which provide educational and networking opportunities for professionals, including an annual Awards for Excellence Dinner. At the time of the events in issue, the GBBC had some 1,200 members, and was governed by a sixteen-member board of directors.
In 1996, the plaintiff David Shephard became a member of the GBBC and began regularly attending its meetings. Shephard is a public relations consultant, with a background in banking. He began devoting his full time to public relations in February 1996, and incorporated his business as Shepard & Associates, Inc., in June 1999. He is the sole shareholder of that corporation. He has been active in a number of cultural, philanthropic, business and communiiy organizations.
In October of 1996, GBBC hired Shephard and Associates, Inc., as its advertisement sales manager. In that capacity Shephard’s company was responsible for selling advertisements for GBBC’s newsletter and program book, and for securing sponsors for GBBC events. GBBC paid Shephard’s company a commission of 15% of ad sales and 25% of sponsorship donations. Shephard was quite successful, bringing in over $100,000 annually to the GBBC. As a result, he earned substantial commissions, amounting to $15,742.06 in 1998.
When Shephard made sales on behalf of GBBC, he would prepare invoices, collect payment, and forward the funds to GBBC’s treasurer. Occasionally, Shephard received checks that sponsors had incorrectly made payable to Shephard & Associates. Shephard never deposited these into his own account, instead forwarding them to GBBC’s treasurer.
In January 1997, a vacancy arose on GBBC’s board of directors, and the board considered Shephard for the position. GBBC’s then president expressed to Shephard the opinion that because he was the ad manager, he may be prevented from serving on the board. The board held a meeting to address the question of whether Shephard’s service on the board would be a conflict of interest. The board consulted legal counsel, and received an opinion to the effect that no *727 conflict existed. The board voted to appoint Shephard to the open board position. Thereafter, Shephard was repeatedly reelected to the board by the membership of GBBC, although during each election some members of the board would raise the question of whether Shephard had a conflict of interest. In 2000, Shephard also held the position of chairman of the events committee, which raised and expended the most money among the GBBC committees.
Lori Pilcher was elected president of the GBBC for a two-year term from January 2000 through December 2001. Pilcher was employed as an audit manager for the Office of Inspector General in the United States Department of Health and Human Services. She made organizing the finances of the GBBC her focus and priority. Her goal was to establish financial accountability within the organization by establishing a general ledger and an annual budget. From the first day of her tenure as president, Pilcher requested that GBBC committee chairs, including Shephard, provide financial documentation of their activities. Subsequently, Pilcher reported to some of the GBBC board members that Shephard was slow in providing financial documentation to her and. that it was provided in “dribs and drabs” and not in the format she requested. At several board meetings in the spring of 2000, Pilcher also raised the issue of whether it was a conflict of interest for Shephard to serve on the board and make decisions about future GBBC events that would affect his commissions as ad manager. Some members of the board agreed with Pilcher that Shephard had a conflict of interest.
On May 11, 2000, Pilcher resigned from her position as president of the GBBC. Pilcher testified at her deposition that she resigned because “I felt uncomfortable with the financial situation ... I was taking matters into hand to try to implement a general system, implement a budget. . . And I was trying to get a handle on what to expect, to make good decision making. Because all the information wasn’t coming I could not make good decisions ...” She went on to say that she and the vice president and the organization’s attorney met and developed recommendations, which they presented at a special board meeting, but that meeting “was veiy much a catastrophe. And that was the grounds which I said, if we don’t do something, I need to leave. Nothing was resolved at that meeting so the next day I resigned.” In discussing her resignation with vice president David Wilson, Pilcher testified, Shephard’s name came up in the context of Pilcher’s repeated requests for financial information, which “I never received during the five months that I was there that I had to request it.” Richer communicated her resignation to the members of the board by e-mail. She outlined her concerns about the GBBC, her reasons for resigning, and her suggestions for improvement.
Richer and the board agreed to keep Pilcher’s resignation confidential from non-board members until after the GBBC’s annual Awards for Excellence dinner, which was scheduled for June 21, 2000. However, in the meantime the GBBC used Rlcher’s name without her permission in connection with a president’s column published in a GBBC newsletter after her resignation. Trish Faass, a board member with whom Pilcher had a personal relationship, provided a copy of the resignation to former board member Rosemary White. White, in turn, anonymously faxed copies of the resignation and of the newsletter to Bay Windows. In doing so, White acted alone, without having conferred with any GBBC board member.
Bay Windows Editor Jeff Epperly assigned Beth Berio to write an article. Berio had never previously reported on the GBBC, and had no previous relationship with any of the people involved. White telephoned Berio and discussed Rlcher’s resignation, but advised Berio that she wished to remain anonymous. White provided Berio with a list of persons to interview. In addition to White, Berio interviewed Pilcher, Wilson, Shephard, former GBBC treasurer Richard Cherkerz-ian, and former GBBC president John F. Kelly. Berio also drew on a February 1999, GBBC treasurer’s report, which she received anonymously. Berio did not contact GBBC’s legal counsel regarding the issue of conflict of interest. She also did not interview the then current treasurer of GBBC, Bruce Weisberg. Berio did not tape record her interviews. She made notes, but kept only a portion of the notes of her interview with Shephard, and none of her other interviews. Shephard told Berio, with respect to the issue of conflict of interest, that “[i]n my tenure it was agreed there was no conflict of interest and two sets of legal counsel said there was no conflict of interest.” The parties have agreed that “[in connection with the reporting and publication of the [a]rticle, no person affiliated with GBBC ever clearly and unambiguously represented to Bay Windows’ editorial, reporting or freelance staff that Shephard had misappropriated monies rightfully belonging to the GBBC,” or “that Shephard had failed to pay his taxes.”
Berio’s article, entitled “Discord at the GBBC,” appeared in the June 22, 2000, edition of Bay Windows. The article ran twenty paragraphs, beginning on the frontpage and continuing on pages 4 and 5. The article discussed Rlcher’s resignation and her reasons for it, quoting and paraphrasing her concerns about financial management and about obtaining financial information. It quoted Richer as saying that she “had to request sales information from David Shephard many times to no avail... I kept getting excuses like, ‘You never told me you needed it that way. We had no controls over David Shephard and how he bills and sells ads.’ ” Shephard, in his deposition testimony, acknowledged that Richer had requested sales information from him on more than one occasion. He insisted that he had given Pilcher what she requested, *728 but acknowledged that after he provided information, Pilcher “wrote back saying ‘I need it this way,’ and I would say, ‘Oh, you didn’t tell me that. I’ll give it to you that way.’ ” Asked whether he had ever said “you never told me you needed this information in that way,” he responded that “I might have . . . It’s all a matter of tone.”
The article asserted that Pilcher’s resignation “resulted in several people blowing the whistle on what they saw as ongoing loose bookkeeping and questionable financial dealings within the organization.” Berio acknowledged in her deposition that in fact only two people, Richer and White, had done what she described as “blowing the whistle”; Berio used the word “several” to maintain White’s anonymity.
The article went on to report complaints about Shephard from “past board members who asked to remain anonymous.” In her deposition testimony, Berio acknowledged that she knew, at the time of the publication, that the reference to “past board members who asked to remain anonymous” was inaccurate. Rosemary White was the only past board member who asked Berio for anonymity; Berio used the plural in another effort to protect White’s identity.
The article then discussed “unconfirmed reports” that Shephard “was receiving checks in the name of Shephard & Associates, his public relations firm, from people who had placed advertising with GBBC.” The sources of the “unconfirmed reports” referred to in the article, according to Berio’s deposition testimony, were Richer and White. Berio testified that she referred to these reports as “unconfirmed” because “I didn’t see the actual check.” On this point, the article included Shephard’s denial, quoting him as saying that one company, the identity of which he could not recall, had sent a check incorrectly made out to his firm, and that he had transmitted it to GBBC. Shephard testified at his deposition, and asserts in an affidavit, that Berio misquoted him on this point; rather than saying he did not recall which company had done so, he told Berio that he declined to identify the company to protect its confidentiality. Berio’s deposition testimony was to the contrary; she testified that “I remember him saying he did not recall.”
The article quoted Richer asserting that Shephard had a conflict of interest because of his role as a board member and his firm’s role as advertising manager. It then turned to an account of the February 1999, resignation of treasurer Cherkerzian, quoting Cherkerzian on a variety of financial concerns, including the GBBC’s failure to issue 1099 forms, specifically with respect to Shephard’s $15,742.06 in commissions. The quotations from Cherkerzian included his comments that “I hope that everyone filed their taxes correctly. Failure to receive a 1099 is not an excuse not to claim the money as income.”
The article then returned to the subject of Pilcher’s resignation, quoting Kelly on her service and on financial management issues, and then reciting Pilcher’s recommendations for change in the organization’s financial management. Finally, the article quoted Rlcher’s statement that “David Shephard has the organization in hostage. What I’m hoping comes out of this is that the board awakens to the fact that it does need to be financially responsible and that they have to eliminate conflict of interest. The GBBC has a lot to offer, but it’s almost like there’s a cancer here that has to be taken care of.”
On the same day that the Bay Windows article appeared, In Newsweekly, another Boston-based weekly newspaper serving the gay and lesbian community, also published an article concerning the GBBC, Rlcher’s resignation, and her claim of a lack of financial controls. The article in In Newsweekly did not mention Shephard by name, but did refer to “the individual on the board receiving certain commissions through advertising sales.”
After publication of the two articles, the GBBC held an emergency meeting of its past presidents and board members to address the issues raised by the articles and to prepare a press release in response. Thereafter, in July of 2000, the GBBC adopted certain changes in its structure and governance, including a change in its by-laws to prohibit board members from receiving fees for services. Shephard voluntarily resigned his position as advertising manager, but remained a member of the board and chairman of events. The GBBC issued a press release about the changes. In August 2000, Bay Windows published a follow-up article, again authored by Beth Berio, entitled “Greater Boston Business Council Restructures.” The article reported the by-law change, and stated that “[w]ith the change, Shephard and Associates, the GBBC’s public relations firm, resigned as advertising vendor for GBBC.”
Shephard brought this action on January 19,2001, and amended his complaint on January 31, 2000, to join Shephard & Associates, Inc. The amended complaint sets forth three counts: libel (count I), invasion of privacy in violation of G.L.c. 214, §1B, (count II), and negligence (count III).
DISCUSSION
This court grants summary judgment where there are no genuine issues of material fact and the record entitles the moving party to judgment as a matter of law. Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Mass.R.Civ.P. 56(c). The moving party bears the burden of demonstrating that there is no genuine issue of material fact on every relevant issue. Pederson v. Time, Inc., 404 Mass. 14, 17 (1989). A party moving for summary judgment who does not bear the burden of proof at trial may demonstrate the absence of a triable issue either by submitting affirmative evidence negating an essential element of the nonmoving party’s case, or by showing that the nonmoving party has no reasonable expectation of proving an essential ele *729 ment of its case at trial. Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). Once the moving party establishes the absence of a triable issue, the party opposing the motion must respond with evidence of specific facts establishing the existence of a genuine dispute. Pederson v. Time, Inc., 404 Mass. at 17. Summary judgment is particularly appropriate in cases involving defamation claims against news media defendants, where the burden of trial may have a significant chilling effect on the exercise of first amendment rights. See e.g. Dulgarian v. Stone, 420 Mass. 843, 846 (1995); King v. Globe Newspaper Company, 400 Mass. 705, 708 (1987), cert. denied, 485 U.S. 940 (1988).
I. Libel
To recover on a claim of libel against a news media defendant, a plaintiff must prove that the defendant published one or more false and defamatory statements, of fact rather than opinion, of and concerning the plaintiffs. See Dulgarian v. Stone, 420 Mass. at 847 (plaintiff has burden of proving falsehood by media defendant, citing federal cases establishing such requirement under first amendment); Lyons v. Globe Newspaper Co., 415 Mass. 258, 262-66 (1993) (statement must be of fact, rather than opinion, unless statement of opinion implies undisclosed facts); Foley v. Lowell Sun Publishing Co., 404 Mass. 9, 11 (1989) (statement must be reasonably susceptible of a defamatory meaning); ELM Medical Laboratory, Inc. v. RKO General, Inc., 403 Mass. 779, 784-85 (1995) (statement must be of and concerning the plaintiff). In addition, the plaintiff must prove that the defendant acted with the requisite degree of fault, and that the publication caused actual injury. See Stone v. Essex county Newspapers, Inc., 367 Mass. 849, 851 (1975).
The degree of fault required depends on whether the plaintiff is a public figure for purposes of the subject matter of the publication. Thus, it is necessary at the outset to determine whether Shephard and his company are public figures for purposes of this action. This question is to be decided by the factfinder, “unless the facts bearing thereon are uncontested or agreedby the parties.” Materia v. Huff, 394 Mass. 328, 330 (1985) (emphasis in original), quoting Lyons v. New Mass Media, Inc., 390 Mass. at 55 (1983), quoting Stone v. Essex County Newspapers, Inc., 367 Mass. at 862. In deciding the issue as a matter of law, the Court must consider “the nature and extent of [the plaintiffs] participation in the particular controversy giving rise to the defamation.” Materia v. Huff, 390 Mass. at 331, quoting Gertz v. Robert Welch, Inc. 418 U.S. 323, 345 (1974). Where the publication giving rise to the claim is circulated only to members of a limited community, “the plaintiffs status as a public figure is determined in relation to those members, rather than to the community at large.” Materia v. Huff, 394 Mass. at 331. “When ‘an individual voluntarily injects himself or is drawn into a particular public controversy[, he] thereby becomes a public figure for a limited range of issues.” Id., quoting Gertz v. Robert Welch, Inc., 418 U.S. at 351. “A public controversy is a dispute in which the outcome ‘affects the general public or some segment of it in an appreciable way.’ ” ELM Medical Laboratory, Inc. v. RKO General, Inc., 403 Mass. at 786, quoting Waldbaum v. Fairchild Publications, Inc., 627 F. 2d 1287, 1296 (D.C.Cir.), cert. denied, 449 U.S. 898 (1990).
Here, the undisputed facts establish that a controversy had existed over a period of years within the board of the GBBC regarding the propriety of Shephard’s dual roles as board member and advertising manager.[2] Shephard and his company were at the center of that controversy, having voluntarily placed themselves there by assuming those roles. The controversy involved the governance of a non-profit organization with a substantial membership, and a significant impact on the Boston area gay community that formed Bay Windows’ readership. The outcome of that controversy would affect that segment of the public in an appreciable way. Under these circumstances, the undisputed facts establish that the plaintiffs were public figures for purposes of this publication.
As a public figure Shephard and his company can establish liability only by proving by clear and convincing evidence that the defendant published one or more statements, otherwise meeting the elements of defamation, with actual malice. See Milgroom v. News Group Boston, Inc., 412 Mass. 9, 11 (1992), citing New York Times Co. v. Sullivan, 376 U.S. 254, 279-80 (1964). “One acts with actual malice by publishing a statement with knowledge of its falsity or with reckless disregard as to its truth or falsity ... To have acted with reckless disregard as to the truth of a statement, one must have entertained serious doubts as to the truth of that statement.” Milgroom, supra (citations omitted).[3]
Although the plaintiffs’ motion papers take issue with the article as a whole and nearly every statement in it, at argument on the present motions the plaintiffs identified seven particular passages that form the basis of their claim of libel. The Court will address these passages in turn. The first is the second sentence of the first paragraph, as follows:
The announcement [of Pilcher’s resignation], which stunned many, resulted in several people blowing the whistle on what they saw as ongoing loose bookkeeping and questionable financial dealings within the organization.
The plaintiffs point out several aspects of this sentence that they contend are inaccurate. The defendant concedes one of the plaintiffs’ claims of inaccuracy; two people, not “several,” made the cited assertions. *730 Others of these contentions amount to mere semantic quibbles; the plaintiffs object to the word “stunned,” and the phrase “blowing the whistle.” However overblown some of the phrasing may be, the sentence cannot form the basis of a claim of libel because it misses two of the necessary elements; it asserts only opinion, not fact, and it is not of and concerning the plaintiffs. The sentence reports that the unnamed sources, however many of them there may have been, perceived “loose bookkeeping and questionable financial dealings within the organization.” On its face, the characterization is of the GBBC, not of Shephard or his company. To be sure, later passages do make specific reference to Shephard in connection with alleged questionable financial dealings; those will be addressed. This sentence, however does not. Moreover, the characterization is expressly identified as the perception of the sources, not as a purported fact.
Next is the fifth paragraph of the article, which reads as follows:
Trouble began, Pilcher said, when she had to request sales information from David Shephard many times to no avail. Shephard is GBBC’s program manager in charge of sales. “I kept getting excuses like, ‘You never told me you needed it that way.’ We had no controls over David Shephard and how he bills and sells ads [in GBBC newsletters and programs].”
Conceding the substantial truth of most of this paragraph,[4] the plaintiffs focus on the last sentence, quoting Richer regarding the GBBC’s claimed lack of “controls” over Shephard. This statement, like the first passage complained of, cannot form the basis of a claim, because it is not defamatoiy of Shephard. “Words may be found to be defamatory if they hold the plaintiff up to contempt, hatred, scorn, or ridicule or tend to impair his standing ... in the minds of a considerable and respectable class of the communiiy.” Grande & Son, Inc. v. Chace, 333 Mass. 166, 168 (1955). That the organization lacked “controls” over him may tend to indict the organization and its management, but does not accuse Shephard of any wrongdoing.
The third passage identified, appearing as the sixth paragraph of the article, appears to be the crux of the claim. It reads:
While past board members, who asked to remain anonymous, voiced complaints about Shephard, unconfirmed reports have also surfaced that Shepard was receiving checks in the name of Shephard & Associates, his public relations firm, from people who had placed advertising with GBBC. None of those sources could provide any proof to Bay Windows that Shephard had engaged in these practices, so it’s impossible to say whether they are accurate allegations or simply part of the common in-fighting and rumors that happen with virtually any non-profit.
The plaintiffs focus on each of the first and second sentences of this paragraph. As to the first sentence, they emphasize Berio’s admission that only one past board member, rather than “members” complained about Shephard. The point is of no consequence; the existence of complaints, of unspecified content, is not in itself susceptible of any defamatoiy meaning.
The second sentence is of far greater concern. The plaintiffs construe this statement as accusing Shephard of misappropriating funds. The defendant responds that the passage does not say so, but merely states that he “received” checks, which he indisputably did prior to turning them over to GBBC. The Court agrees with the plaintiffs on this point. The statement, read in a natural manner according to its plain terms, is susceptible of the meaning that Shephard and his company received and kept funds intended for and rightfully belonging to GBBC. That construction draws support from the overall tenor of the article, with its emphasis on alleged financial improprieties. As so construed, the sentence would certainly tend to hold the plaintiffs up to contempt and to impair their standing among a considerable and respectable class of the community.
The defendant points out the article’s qualification of the statement by explicitly acknowledging the unconfirmed nature of the sources, and the absence of proof. These qualifiers may have mitigated the damage by reducing the likelihood that readers would believe the statement, and thereby think less of the plaintiffs, but they do not insulate the defendant from liability. Indeed, the qualifiers reinforce the defamatory interpretation of the statement; if all that was meant was that Shephard received checks and passed them on to GBBC, the references to unconfirmed sources and lack of proof would be nonsensical. This statement meets the requirements of a defamatoiy statement: it is of and concerning Shephard, it asserts a fact rather than an opinion, it is susceptible of a defamatory meaning, and that meaning is false.
What remains to establish liability based on this statement is proof that the defendant published the statement with actual malice, in the sense of knowledge of its falsity or reckless disregard for its truth or falsity. On this point, despite the predominance of undisputed facts in this case, the Court concludes that neither side has established the absence of genuine factual dispute, and the issue must remain for trial. The record reveals that Berio obtained information to the effect set forth in the statement from Pilcher and White, and that she received a denial from Shephard. Berio knew that White was a former, but not present, board member, and that Pilcher had been president until her recent resignation. The record does not reveal precisely what Pil-cher and White told Berio on this topic, or how they *731 claimed to have obtained the information. The article itselfadmitsthatthedefendantrecognizedthesources as “unconfirmed,” and that it lacked “proof.” These facts do not provide a basis for a conclusion that the defendant had actual knowledge of falsity, but would permit, although not compel, a jury to infer that the defendant entertained serious doubts as to the truth of the statement. That inference would support a finding of malice. Accordingly, the plaintiff is entitled to a trial on his claim of libel with respect to this passage.
The fourth passage appears in the next paragraph, which quotes Shephard’s denial of the allegations against him. The following statement appears:
“I have never asked or requested anyone to make a check payable to Shephard & Associates. Every instruction goes out in writing and it says to make the check payable to GBBC and mail to Shephard & Associates, but I can remember in the last 12 months, one company making the mistake of making the check payable to Shephard & Associates. I did not deposit that check, but I made it payable to GBBC, and it was deposited directly to GBBC.” Asked which company sent that check, Shephard said he couldn’t recall.
The claimed inaccuracy in this passage is the last sentence; Shephard denies having said he could not recall, and asserts that he declined to identify the client so as to protect the client’s privacy. The point is disputed; Berlo, as noted supra, testified in her deposition that Shephard told her he could not recall. The inaccuracy, if it is such, is obviously not in itself defamatory, and the plaintiffs do not contend that it is. Their argument is that in context, the erroneous assertion of a claim of inability to remember tends to undermine the quoted denial, so as to exacerbate the effect of the accusation contained in the previous passage. Further, the plaintiffs contend, deliberate inaccuracy on this point would tend to support an inference of malice with respect to that accusation. The Court agrees. This passage in and of itself does not support a claim of libel, but if a jury finds it false, it could properly consider it as to the issues of both malice and damages with respect to the previous passage.
The fifth passage cited is the next paragraph, which reads as follows:
Meanwhile, other GBBC members complained that Shephard receives commissions on ad sales and sits on the boarda conflict of interest, they say. Said Pilcher: “I got a hold of a financial statement before I was president on Jan. 1. As a CPA, I found trends that raised a red flag. I immediately got together with the vice president [David Wilson] and the treasurer [Bruce Weisberg]. Bruce and I went to meet with David Shehard. There was a conflict of interest for many of us in that he receives commissions from ad sales and sponsors, and yet he’s a voting member on the board ... I told him what my concerns were and that our balances were climbing and we need to have better controls over them. I needed to have a better sense of what was going on.”
The plaintiffs construe this passage as asserting that Shephard had a conflict of interest. He contends that that assertion was false, because counsel for the GBBC had opined that he did not. Whether Shephard had a conflict of interest is a matter of opinion. The facts from which one might form an opinion on the subject are undisputed, and appear in the article: Shephard held a seat on the board, while his company served as advertising manager and received commissions for that service. Pilcher viewed those facts as establishing a conflict of interest. Others, including counsel for the GBBC, disagreed. The article stated Pilcher’s opinion, along with the facts on which that opinion was based. Disclosure of the contrary opinion of counsel certainly would have provided more balance, but the law of defamation does not require balance. No false statement of fact appears in this passage, and it cannot form the basis of a claim of libel. See Dulgarian v. Stone, 420 Mass. at 849.
The next passage in issue appears in a discussion of the February 10, 1999, resignation of Rich Cherkez-ian as treasurer. The article quotes a report issued by Cherkerzian, as follows:
In a treasurer’s report dated Feb. 3, 1999, Cherkerzian wrote that he discovered 1099 tax forms from previous years had not been filed. For example, he stated, “David Shephard’s Shephard & Associates is not an employee and is not a corporation. Because we have paid Shephard & Associates $15,742.06 in commissions for advertising and sponsorships in 1998, we must file a Form 1099 Misc. In a discussion with David Shephard, he mentioned to me that he has never received a 1099 from the GBBC in the two years that he has been selling advertising for us.” Consequently, Cherkerzian discovered that 1099 forms had not been filed for 1996 and 1997 “and perhaps earlier years as well,” he said.
Cherkerzian warned the board of serious tax consequences if the IRS conducted an audit of GBBC’s books, saying, “I hope that everyone filed their taxes correctly. Failure to receive a 1099 is not an excuse not to claim the money as income. This might open the GBBC to potential liability from a service provider.” In addition, Cherkerzian warned there was no statute of limitations for failure to file.
The plaintiffs contend that this passage implies that Shephard did not pay his taxes. The defendant responds that no reasonable reader could adopt that interpretation. On this point, the Court agrees with defendant. The passage, read as a whole, expresses Cherkerzian’s criticism of the GBBC for failing to *732 meet its legal obligation to issue 1099 forms; it ex-pressesnocriticismofShephard. On the contrary, the quoted portion of the treasurer’s report credits Shephard with triggering Cherkerzian’s inquiry on the subject by alerting Cherkerzian that he had not received 1099 forms from the GBBC. Cherkerzian’s expression of “hope,” read in context, appears to encompass Shephard and others, and implies nothing more than the risk that a payor’s failure to issue 1099 forms might lead to a payee’s failure to report income. Nothing in the passage suggests that Cherkerzian, or the author of the article, would have any knowledge, beyond the information disclosed, as to whether Shephard or any other service provider did or did not report the income received and pay taxes on it.
The final passage in issue is the second to last paragraph of the article, as follows:
The way things are at the GBBC now, Pilcher said, “David Shephard has the organization in hostage. What I’m hoping comes out of this is that the board awakens to the fact that it does need to be financially responsible and that they have to eliminate conflict of interest. The GBBC has a lot to offer, but it’s almost like there’s a cancer here that has to be taken care of.”
This passage, on its face, expresses Pilcher’s opinion that Shephard has a conflict of interest, and that the board has been irresponsible in allowing that conflict to persist. As discussed supra, such opinion, based as it is on undisputed facts stated in the article, cannot form the basis for a claim of libel.
In sum, the plaintiffs’ claim of libel presents a triable issue of fact with respect to the statement in the sixth paragraph of the article regarding “unconfirmed reports” that the plaintiffs received checks intended for the GBBC. The statement in the seventh paragraph, to the effect that Shephard had said he could not recall the identity of the one client who sent a misdirected check, tends to support the plaintiff s claim with respect to the sixth paragraph, although it cannot form the basis of a claim in itself. As to the various other passages cited, the claim of libel must be dismissed.
II. Invasion of Privacy
To prevail on a claim of invasion of privacy in violation of G.L.c. 214, § 1B, a plaintiff must prove that the defendant disclosed “highly personal or intimate” information concerning the plaintiff. See Bratt v. International Business Machines Corp., 392 Mass. 508, 518 (1984). Where the information is newsworthy, the disclosure is privileged, even if it would otherwise be of a private and intimate nature. See Boston Herald, Inc. v. Sharpe, 432 Mass. 593, 612 (2000); Peckham v. Boston Herald, Inc., 48 Mass.App.Ct. 282, 289 (1999). Massachusetts law does not recognize a claim of invasion of privacy based on a theory of putting a plaintiff in a false light. See ELM Medical Laboratory, Inc. v. RKO General, Inc., 403 Mass. at 787.
The only information the plaintiffs have identified as private for purposes of this claim is the amount of the commissions paid by GBBC to Shephard & Associates, Inc., in 1998. Those commissions were paid from the funds of a non-profit membership organization, upon approval of its sixteen-member board of directors. Under these circumstances, there can be no doubt that all sixteen board members knew or had access to the information, and the members of the organization may have had access as well. In their capacity as fiduciaries to the organization, the board members were accountable to the members for their use of the organization’s funds to pay the commissions. Under these circumstances, the information cannot reasonably be viewed as intimate and personal. Compare Peckham v. Boston Herald, Inc., 48 Mass.App.Ct. at 289 (disclosure of paternity suit against prominent professional).
III. Negligence
For the reasons already discussed, the plaintiffs cannot prevail against the defendant on a theory of negligence; the defendant’s statements regarding the plaintiff, a limited purpose public figure, are protected by the first amendment absent a showing of malice. Accordingly, count III of the complaint, alleging negligence, must be dismissed.
CONCLUSION AND ORDER
For the reasons stated, the Defendant’s Motion for Summary Judgment is ALLOWED in part and DENIED in part, and it is hereby ordered as follows: Count I of the complaint is dismissed except insofar as it rests on the statements contained in the sixth and seventh paragraphs of the article; count I shall stand for trial as to those statements. Counts II and III of the complaint are dismissed. The Plaintiffs Motion for Summary Judgment is DENIED.

The parties have admitted virtually all of each other’s assertions of undisputed fact in their statements pursuant Superior Court Rule 9A(b)(5). Both sides, however, have included in their memoranda additional factual assertions, not contained in those statements, but supported by evidentiary materials referenced. 1416 Court has reviewed the materials cited in an effort to determine whether any of these factual assertions is in genuine dispute and is material to the issues presented by these cross motions.

The plaintiffs point out that Shephard & Associates, rather than Shephard himself, held the role of advertising manager, and that the article erred on this point. The distinction is immaterial. As sole shareholder, Shephard controlled his company and reaped all profits from it.

Malice, for this purpose, is a term of art. Contrary to the defendant’s suggestion at argument, it does not require ill will or an intention to cause harm. See Milgroom, supra.

As noted supra, the imprecision with respect to Shephard’s title, and the distinction between him and his company, is of no consequence.